# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,      )
                                             )
           **Plaintiff,**        )
                                             )
v.                                     )     **Case No. 14-CR-0162-CVE**
                                           )
JOSHUA ELI OWEN,           )
a/k/a Joshua Owens,          )
a/k/a Joshua Owen           )
                                           )
          **Defendant.**       )

## OPINION AND ORDER

Before the Court is defendant's motion to suppress evidence (Dkt. # 17). Defendant is charged as a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) (count one), and with possession of a firearm after conviction of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. §§ 922(g)(9), 924(a)(2) (count two). Dkt. # 13. Defendant moves to suppress the firearm that Tulsa Police Department (TPD) officers recovered during a dispatch call of domestic assault and battery with a firearm, arguing that the officers' entry into the residence, sweep, investigation, and seizure of the firearm, all without a warrant, violated the Fourth Amendment. Dkt. # 17, at 2-6. Plaintiff responds that defendant lacks standing to assert a Fourth Amendment violation, that the officers' actions are within exceptions to the Fourth Amendment's warrant requirement, and that the independent source doctrine applies. See Dkt. # 21, at 2-7. The

Court held an evidentiary hearing on November 24, 2014,[1] at which Chelsi Moore, TPD Officer Mitchell Franklin, and TPD Officer Derek Sullins testified.

## I.

On July 26, 2014, Officers Franklin and Sullins responded to a dispatch call of domestic assault and battery with a firearm at a residence in the 100 block of North 37th West Avenue in Tulsa, Oklahoma. As part of the encounter, officers seized a firearm. The testimony of the witnesses at the evidentiary hearing as to the events of that night, including the recovery and seizure of the weapon, is summarized below.

### A. Testimony of Officers Franklin and Sullins[2]

The officers responded to the dispatch call at approximately 10:00 p.m. on July 26, 2014. When the two officers arrived, they knocked on the front door. Moore opened the door halfway and stood in the doorway while speaking to the officers. Both officers testified that Moore looked disheveled and upset. Officer Franklin testified that she was visibly shaking; Officer Sullins testified that he saw marks on her face, although he was unsure if the marks were simply dirt. To both Officer Franklin and Officer Sullins, Moore's actions and manner were those they would expect of a victim of domestic abuse. The officers explained their presence, saying they had received a call about an argument between Moore and her boyfriend involving a firearm. They asked Moore if there had been an argument and if her boyfriend was in the residence; she denied that an argument had

---

[1]      In briefs, both parties referred to and analyzed the officers' actions as a search. See Dkt. # 17, at 2; Dkt. # 21, at 2. However, at the evidentiary hearing, both parties agreed that the events should be analyzed as an entry and a seizure of the firearm.

[2]      With one exception, which is noted below, the officers' testimony was entirely consistent and will be summarized together.

occurred and said that her boyfriend was not present. The officers explained that they needed to enter the home in order to determine the safety and welfare of the occupants, saying that they would ensure that all was well and then they would leave. Moore opened the door wider and stepped back, gesturing. The officers entered the home; neither officer explicitly asked Moore for permission to enter, nor did Moore explicitly deny them permission to enter. Upon entering, the officers performed a sweep of the residence, discovering Moore's two young sons (ages seven and five years) and defendant.

The officers found defendant in the residence's master bedroom. Officer Franklin entered the room and placed defendant in handcuffs. He told defendant that he was not being arrested but that he was being detained while the officers analyzed the situation. Together, the officers escorted defendant to the residence's enclosed front porch. Other officers, including TPD Corporal Dan Miller, had arrived by this time; one of these officers remained with defendant on the porch while Franklin, Sullins, and Miller stayed with Moore inside the residence. At some point while Moore was on the porch, he told an officer that he had a prior felony conviction.

Officer Sullins and Corporal Miller conversed with Moore in the kitchen, while Franklin stood nearby. Moore was much more forthcoming with Corporal Miller, who had previously been to Moore's home in response to a domestic abuse call not involving defendant. Moore told Corporal Miller that she and defendant were dating, and she admitted that they had gotten into a loud verbal altercation. However, in response to his questioning she denied that there was a firearm in the residence. At that point, one of Moore's children interjected, stating that there was a firearm and that he knew where it was located. Officer Franklin testified that he asked the child to tell him where the firearm could be found. Officer Sullins initially testified that Officer Franklin directed the child to

divulge the location, although he later stated that he could not recall if Officer Franklin asked or directed the child.

The child did not respond verbally to Officer Franklin, but instead went to the master bedroom. Officer Franklin followed the child into the room; he was the only person in the room with the child. He testified that the child walked to a dresser near the bed, opened a drawer, and pulled out the firearm. Officer Franklin immediately retrieved the weapon from the child. Officer Franklin then returned to the kitchen and asked Moore about the firearm. She said that the weapon belonged to her and that she had gotten it as protection against a previous abusive boyfriend. She later told officers that they could take the firearm and that she no longer wanted it. Both officers testified that, in their experience, it is better to remove a firearm from a potential domestic abuse situation in case of a re-escalation after officers leave. The officers explained to Moore that they would put the firearm into evidence; if she decided to reclaim it, she need only go to the TPD evidence storage facility. The officers then released defendant, and before 11:00 p.m. they left the residence.

## B. Testimony of Chelsi Moore

Moore and her two children live in a residence in the 100 block of North 37th West Avenue, Tulsa, Oklahoma. Moore and defendant began dating approximately one month prior to July 26, 2014. Although defendant did not reside with Moore, he had spent three to four nights sleeping at Moore's residence in the week prior to the altercation and had kept some of his clothing there. However, he had not transferred all of his belongings, he did not pay rent, and he maintained a separate residence with his mother. Moore had not given him a drawer in her dresser in which to store his possessions. Defendant arrived at Moore's home on July 25, 2014, and he spent that night

and the following day with her and her children. According to Moore's testimony, defendant possessed the firearm when he arrived at her home on July 25.

On the afternoon of July 26, 2014, Moore and defendant began drinking, consuming what was, for Moore, a significant amount of alcohol. While she and defendant were drinking, Moore and her children saw defendant handle the firearm, holstering and unholstering it. Later that night, Moore and defendant got into a heated argument;[3] Moore's children, who were present at the time, became frightened and ran to Moore's sister's nearby home. Moore testified that her sister called the TPD, although Moore was unaware of the call prior to officers' arrival. Moore answered a knock on her door to find TPD officers. She thought that there were three officers at the door. The officers already knew defendant's first name and asked specifically if he was present. Moore could not recall the entire conversation she had with the officers at the door, including whether she denied defendant's presence. She could not recall if she gave explicit consent for the officers to enter, but she did not deny them permission to enter. She testified that the officers entered the home and remained in the living room, and that defendant approached the officers from the bedroom. She did not testify that defendant was found in the bedroom. Moore did not see the officers place defendant in handcuffs or take him to the enclosed front porch.

Moore claimed that, at some point, her sister arrived, bringing Moore's children back to the residence. By this time, Moore was in the kitchen with several officers while defendant remained handcuffed outside. One of the officers speaking to Moore was Corporal Miller, with whom Moore was previously acquainted. Miller asked if there was a firearm in the residence, and Moore said that

[3]     While Moore initially testified that the argument was verbal, she later admitted that defendant had choked her or thrown her to the ground. However, she maintained that he never struck her.

there was no firearm. One or both of Moore's sons then told officers that there was a firearm and that he or they would show the officers where it was located. Moore testified that the officers neither asked the children about the firearm prior to the independent assertion that one was present, nor told the child or children to find the firearm for the officers. One of the children led an officer to the master bedroom, and the officer returned with the firearm. When the officer asked her about the firearm, Moore said that the gun belonged to her. She testified that she lied to the officers about her ownership of the gun in order to keep defendant out of prison.

Although the Court finds that Moore was credible as to the inception and course of her relationship with defendant, it also finds that her memory of many important details (including the number of officers at the door, whether the children were present when officers arrived, where officers placed defendant in handcuffs, and whether one or both of her children told officers about the firearm) may have been clouded by her consumption of alcohol on the date in question. Therefore, the Court relies primarily on the officers, whom the court finds credible, for the most accurate account of the events on the evening of July 26, 2014.

## II.

The purpose of a suppression hearing is "to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). "The proponent of a motion to suppress has 'the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search.'" United States v. Gama-Bastidas, 142 F.3d 1233, 1238 (10th Cir. 1998).

# III.

Defendant argues that the warrantless entry into the residence, the officers' decision to sweep the residence and then investigate following the sweep, and the seizure of the firearm violated the Fourth Amendment and that, as a result, the firearm should be suppressed. Dkt. # 17, at 2. Plaintiff responds that defendant lacks standing to raise a Fourth Amendment challenge, that officers' actions fall within an exception to the Fourth Amendment's warrant requirement, and that the independent source doctrine applies. Dkt. # 21, at 3, 6. The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "[T]he judicially created exclusionary rule . . . excludes evidence obtained in violation of the Fourth Amendment from being used at trial." United States v. McCane, 573 F.3d 1037, 1042 (10th Cir. 2009) (citing Herring v. United States, 555 U.S. 135 (2009)).

## A. The Entry

Defendant argues that officers' entry into the home without a warrant violated the Fourth Amendment. Plaintiff responds that defendant lacks standing and that both the consent and exigent circumstances exceptions apply. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (internal punctuation omitted). However, a number of exceptions to this principle exist. E.g., Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (exigent circumstances); United States v. Matlock, 415 U.S. 164, 171 (1974) (voluntary consent). If an exception applies, then a warrantless entry to a home is reasonable and, therefore, does not offend the Fourth Amendment. Illinois v. McArthur, 531 U.S. 326, 330 (2001).

1. Standing as to the Entry

Plaintiff argues that defendant lacks standing to raise a Fourth Amendment challenge to the entry. To suppress evidence due to a Fourth Amendment violation, a defendant must first "demonstrate that it was his Fourth Amendment rights that were violated." United States v. Davis, 750 F.3d 1186, 1189 (10th Cir. 2014).[4] A search or seizure implicating a defendant's Fourth Amendment rights occurs in one of two situations: when the officers "'physically intrud[e]' on persons, houses, papers, or effects," Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quoting United States v. Jones, 132 S. Ct. 945, 950-51 n.3 (2012)); or when the person "has an expectation of privacy . . . and that . . . expectation is reasonable." Carter, 525 U.S. at 88 (citing Rakas, 439 U.S. at 143-44). The trespass doctrine enunciated in Jones and Jardines requires an existing constitutional property interest. See Jardines, 133 S. Ct. at 1414. As defendant was a guest in Moore's residence, he lacks the requisite property right in the residence for the trespass doctrine. Thus, he must have had a reasonable expectation of privacy in the residence to assert his Fourth Amendment rights.

To determine whether an individual has a reasonable expectation of privacy, courts ask two questions: "First, did [defendant] manifest a subjective expectation of privacy . . . ? Second, is that expectation one society is prepared to recognize as reasonable?" United States v. Barrows, 481 F.3d

_____

[4]     The Tenth Circuit has often referred to this concept as "standing." See, e.g., United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009) ("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search." (citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990))). The Supreme Court has disapproved of referring to this concept as "standing," stating that it "is more properly subsumed under substantive Fourth Amendment doctrine." Rakas v. Illinois, 439 U.S. 128, 139 (1978); see also Minnesota v. Carter, 525 U.S. 83, 87-88 (1998). While recognizing the Supreme Court's pronouncements and discussing the issue as part of its substantive analysis of the Fourth Amendment, the Tenth Circuit has continued to refer to the concept as "standing." See, e.g., Davis, 750 F.3d at 1190. This opinion and order will follow the Tenth Circuit's lead and reference this concept as "standing."

1246, 1248 (10th Cir. 2007). "It is axiomatic that people have a reasonable expectation of privacy in their own homes." United States v. Maestas, 639 F.3d 1032, 1035 (10th Cir. 2011) (citing Griffin v. Wisconsin, 483 U.S. 868, 884 (1987)). "[I]n some circumstances a person may have a legitimate expectation of privacy in the house of someone else." Carter, 525 U.S. at 89. An overnight guest has a reasonable expectation of privacy in the residence where he is staying. Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). In the Tenth Circuit, a social guest who does not stay overnight has a reasonable expectation of privacy in a residence when the guest has a "degree of acceptance into the household." Poe, 556 F.3d at 1122 (citing United States v. Rhiger, 315 F.3d 1283, 1285 (10th Cir. 2003)). By contrast, "'an individual does not possess an expectation of privacy . . . when he or she is present solely for commercial or business reasons' and otherwise has no meaningful connection with the home." Maestas, 639 F.3d at 1036 (quoting Rhiger, 315 F.3d at 1286).

Moore's testimony, which the Court finds credible on this point, is that defendant was an overnight guest in Moore's home, giving him a reasonable expectation of privacy in the residence. Even if he were merely a social guest who would not stay the night, Moore's testimony about the course of their relationship and the previous nights spent at the residence show that defendant had achieved the "degree of acceptance into the household" needed to create a reasonable expectation of privacy. See Poe, 556 F.3d at 1122. As defendant had a reasonable expectation of privacy in the residence, he has standing to assert a violation of his Fourth Amendment rights in the officers' entry of the residence.

### 2. Applicability of the Consent Exception

Consent is an exception to the general requirement that officers' entry into a home be made with a warrant. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The requisite consent may

come not only from defendant but also "from a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). Valid consent requires that the party have actual or apparent authority to consent and that the consent be free and voluntary. United States v. Sanchez, 608 F.3d 685, 689 (10th Cir. 2010). As the permanent resident of the home, Moore has actual authority to consent to entry. See United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir. 2008).[5] Therefore, the question is whether any consent was free and voluntary.

"Voluntariness is a factual issue, determined through the totality of the circumstances." United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007) (citing United States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000)). "[A] defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." Id. at 789-90. As part of demonstrating that any consent was given freely and voluntarily, "[t]he government must prove consent was given without duress or coercion, express or implied." United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992) (citing United States v. Price, 925 F.2d 1268, 1270-71 (10th Cir. 1991)). The Tenth Circuit has established a number of factors for courts to consider in determining whether consent was coerced, including:

> [T]he threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a persons personal effects such as identification and plane or bus tickets;

---

[5]     Actual authority is "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999). While it is unknown if Moore owns or rents the residence, there can be no serious dispute that she has "control for most purposes over it."

a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).

The Court finds that Moore gave free and voluntary consent to the officers' entry and that her consent was not coerced. The testimony of both officers, which the Court finds credible, was that after the officers explained their purpose and the need to look through the residence, Moore opened the front door more completely, stepped back, and gestured for officers to enter. A reasonable officer would have understood these actions to mean that the officers could enter and perform the requested sweep. See Geurrero, 472 F.3d at 790 (noting that "a palms-up signal indicates consent"). Further, the Court finds that the consent was not coerced. Only two officers spoke to Moore, and neither they nor she testified as to the brandishing of a weapon, physical touching, use of aggressive language, or any request that Moore accompany the officers to the police station. While the officers did retain the firearm at the ultimate end of the encounter, this was done at Moore's explicit request. The two factors potentially indicating coercion are that the conversation occurred in a nonpublic place without other members of the public present. These factors are not enough to convince the Court that Moore's consent was coerced, as they would frequently be present when officers seek consent to enter a home. Having found that Moore had the actual authority to consent and that she freely, voluntarily, and without coercion provided that consent, the Fourth Amendment was not violated when the officers entered the residence without a warrant.[6]

---

[6]     As the Court finds that Moore gave valid consent to the entry, the Court does not address whether the exigent circumstances exception applies.

B. The Sweep and Subsequent Investigation

Defendant argues that the officers' sweep[7] and ensuing investigation violated the Fourth Amendment. Plaintiff maintains that the exigent circumstances exception applies to all of the officers' actions. A sweep based on exigent circumstances is proper "if reasonable grounds existed to search to protect the safety of someone besides the officers." Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1072 (10th Cir. 2010) (citing Walker, 474 F.3d at 1254). Such an action "must be 'strictly circumscribed by the exigencies which justify its initiation.'" Id. at 1073 (quoting Mincey v. Arizona, 437 U.S. 385, 393 (1978)). In Armijo, the Tenth Circuit found that the "urgent need" to determine if the defendant was the source of multiple bomb threats to a high school justified police officers' entry and sweep of defendant's home. Id. at 1072. The Court finds that a similar need existed here, albeit on a smaller scale. The officers were called to Moore's residence to resolve an alleged incident of domestic violence involving a firearm. When Moore answered the door, she appeared upset and disheveled, and during the conversation the officers formed the opinion that she could be a victim of domestic violence. Further, Moore's two young children were present in the home. While domestic violence situations do not automatically create exigent circumstances, see United States v. Davis, 290 F.3d 1239, 1244 (10th Cir. 2002), the need to ensure the safety of Moore and her children from a potential armed threat were exigent circumstances justifying the sweep. As exigent circumstances existed, the sweep did not violate the Fourth Amendment.

_____

[7]     While the officers did sweep the residence for danger or injuries, it was not a "protective sweep" as that term is often used. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). However, "a 'protective sweep' of a residence to ensure officer safety may take place only incident to an arrest." United States v. Walker, 474 F.3d 1249, 1254 (10th Cir. 2007). As defendant was not arrested, the sweep was not a "protective sweep." See Walker, 474 F.3d at 1254.

Defendant argues that the officers' decision to investigate following the sweep, rather than leaving the premises as they had told her they would, also constitutes a violation of the Fourth Amendment.[8] However, the officers' decision to remain in the home and question Moore was not an event implicating the Constitution. The Fourth Amendment applies to unreasonable searches and seizures only. See U.S. CONST. amend. IV. A consensual encounter between an individual and police officers, even inside a home, does not offend the Fourth Amendment. See United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005); see also United States v. Kim, 27 F.3d 947, 953 (3d Cir. 1994) ("As far as consent is concerned, one may consent to an encounter in the privacy of his own home or in a public square."). "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 439 (1991). Several factors are relevant to determining whether a person was free to end an encounter with officers, including:

> [T]he location of the encounter, particularly whether the [individual] is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the [individual]; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the [individual's] personal effects such as tickets or identification; and whether or not they have specifically advised [the individual] at any time that he had the right to terminate the encounter or refuse consent.

Spence, 397 F.3d at 1283 (quoting United States v. Zapata, 997 F.2d 751, 756-57 (10th Cir. 1993)).

---

[8]     Defendant makes no argument that his being detained in handcuffs outside of the residence violated the Fourth Amendment. Thus, the Court does not address the issue.

Considering the totality of the circumstances, Moore's conversation with officers was a consensual encounter. The conversation occurred in a non-public space, but "[t]here is no per se rule that a police encounter within an individual's home is a seizure within the meaning of the Fourth Amendment." Id. The officers did not touch Moore or display their weapons. Presumably the officers were in uniform, although this is unclear, as is the officers' precise demeanor and tone during the encounter. The officers did not retain any personal effects other than the firearm, and this was done with Moore's explicit permission. The officers did not state that they advised Moore of her ability to end the encounter, but Officer Sullins testified that Moore made clear her preference to speak to Corporal Miller instead of Officer Sullins. Finally, Moore had already consented to the officers' entry and sweep of the residence. The totality of circumstances shows that the conversation was a consensual encounter between Moore and the officers, and as such the Fourth Amendment is not implicated. Defendant's Fourth Amendment rights were not violated by either the sweep or the officers' subsequent investigation.

C. The Seizure

Defendant's final argument is that the warrantless seizure of the firearm violated the Fourth Amendment. Plaintiff responds that defendant lacks standing to contest the seizure and that exceptions to the warrant requirement apply. Although the actual events were continuous, the clearest analysis of the seizure results from considering those events that occurred before Officer Franklin recovered the firearm as separate from those that occurred afterwards.

1. Standing as to the Seizure

It is not clear whether defendant has standing as to the seizure of the firearm. Standing requires officers either to trespass on an applicable constitutional interest, Florida v. Jardines, 133

S. Ct. 1409, 1414 (2013), or to violate defendant's reasonable expectation of privacy. <u>Minnesota v. Carter</u>, 525 U.S. 83, 87-88 (1998). Neither analysis is without complications. Defendant owned the firearm, giving him a property interest that could trigger the trespass doctrine. <u>See</u> U.S. CONST. amend. IV (prohibiting unreasonable seizures of "effects"). Ownership "does not confer 'automatic standing,'" but it "is a 'factor to be considered in determining whether an individual's Fourth Amendment rights have been violated.'" <u>United States v. Anderson</u>, 154 F.3d 1225, 1231 (10th Cir. 1998) (quoting <u>United States v. Salvucci</u>, 448 U.S. 83, 91 (1980)); <u>see also</u> <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 105 (1980). However, unlike the defendants in <u>Jones</u>, <u>Jardines</u>, and other similar cases, defendant did not claim or obviously possess an interest in the firearm at the time of the seizure; the officers believed that the firearm belonged to Moore. Thus, it is unclear whether the trespass doctrine is applicable. Likewise uncertain is whether defendant possessed a reasonable expectation of privacy that would give him standing as to the seizure. Defendant had a reasonable expectation of privacy in Moore's residence, where the firearm was found. However, the firearm was not simply left with defendant's other belongings in the residence; it was hidden in Moore's dresser. The Supreme Court has held that an individual does not necessarily have a reasonable expectation of privacy in another's container, even when that container contains the individual's property. <u>Rawlings</u>, 448 U.S. at 104-105 (finding defendant lacked a reasonable expectation of privacy in illegal drugs he had placed in a friend's purse). The facts are insufficient to determine if defendant had a reasonable expectation of privacy in the dresser. However, the Court need not resolve defendant's standing to resolve his motion. The Court will assume that defendant has standing to assert a violation of his Fourth Amendment rights as to the seizure of the firearm.

## 2. Officers' Actions Before the Recovery

The officers' actions prior to Officer Franklin's recovery of the firearm were within the exigent circumstances exception to the Fourth Amendment.[9] The Supreme Court has stated that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (quoting Mincey v. Arizona, 437 U.S. 385, 392 (1978)). The Tenth Circuit follows a two-part test to determine if "the risk of personal danger created exigent circumstances: . . . whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and [whether] (2) the manner and scope . . . [of the officers' actions] is reasonable." United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006). "The existence of exigent circumstances is a mixed question of law and fact." United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011) (quoting United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)).

The first prong of the analysis requires that the officers have had "an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others." Najar, 451 F.3d at 718. While no cases are directly on point for an officer's entry to a bedroom when

---

[9]     It is also possible that the community caretaking exception applies. "[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993) (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). While some circuits allow searches and seizures inside homes under this exception, see, e.g., United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006), the Tenth Circuit has thus far limited its use primarily to automobile searches and brief seizures of persons. See United States v. Garner, 416 F.3d 1208, 1213-14 (10th Cir. 2005) (collecting cases). The Tenth Circuit has not addressed a situation like the one here, and as the exigent circumstances exception applies, the Court need not determine if Officer Franklin's actions were within his community caretaking function.

a child has gone into the room to retrieve a weapon, several cases involving a similar entry to a room or home are illustrative. The Supreme Court, deciding <u>Ryburn v. Huff</u>, 132 S. Ct. 987 (2012), found that a woman's initial unwillingness to answer officers' knocking as well as her flight into the home's interior when asked about firearms gave officers an objectively reasonable basis to believe that they faced imminent harm, even though the woman did not actually attempt to retrieve a weapon. <u>Id.</u> at 989-991. In <u>Najar</u>, the Tenth Circuit determined that officers' entry to a trailer and search for injured persons was objectively reasonable where the officers had received a 911 call from the residence and where the defendant, who claimed to be the only person present, denied making the 911 call. <u>Najar</u>, 451 F.3d at 720. By contrast, in <u>United States v. Davis</u>, 290 F.3d 1239 (10th Cir. 2002), the Tenth Circuit found that officers lacked an objectively reasonable basis to enter the home of an alleged domestic abuser--even when the defendant disobeyed officers' instructions and reentered the home to get one of his children--for the following reasons: the officers had spoken to the possible victim, who showed no signs of abuse; the officers knew that the defendant had children; and the defendant was not violent and had no history of violence. <u>Davis</u>, 290 F.3d at 1243-44.

The facts of this case have far more in common with <u>Ryburn</u> and <u>Najar</u> than <u>Davis</u>. The dispatch call to which the officers responded was one for domestic assault with a firearm. Moore, speaking with Corporal Miller in her kitchen, denied that there was a firearm in the residence. When she did, one of her children voluntarily informed the officers that there was a firearm and that the child knew its location. Officer Franklin either asked or directed the child to tell him the location of the firearm. The child did not respond verbally but instead entered the master bedroom. The obvious implications of the child's action were that there truly was a firearm in the residence and

that the child intended to retrieve the firearm personally, rather than simply providing Officer Franklin with its location. Officer Franklin could not know at that point whether the firearm was loaded. While the situation was unlike <u>Ryburn</u> in that Officer Franklin would not necessarily have feared an attack, he would certainly have been concerned for the young child's potential to harm himself or others accidentally. Thus, Officer Franklin's decision to follow the child into the master bedroom and then take the weapon from the child were objectively reasonable.

The second prong of the analysis requires "the manner and scope . . . [of the officers' actions] [be] reasonable." <u>Najar</u>, 451 F.3d at 718. In <u>United States v. Gordon</u>, 741 F.3d 64 (10th Cir. 2014), the Tenth Circuit found a search reasonable where an officer followed an upset victim of domestic abuse from the basement to her upstairs bedroom and, on the way, saw and seized a loaded shotgun. <u>Id.</u> at 70-71. The court noted that the officer had been told about the presence of weapons and that the victim feared for her life, but he did not know that the alleged abuser was already in custody. <u>Id.</u> at 70. Likewise, in <u>Najar</u> the Tenth Circuit found the scope and manner of a search reasonable where officers searched only those areas where a person, whom they believed to be in need of aid, could be found. <u>Najar</u>, 451 F.3d at 720. Like the officer in <u>Gordon</u>, Officer Franklin had good reason to follow the child: based on the child's statement, Officer Franklin would reasonably have believed that the child intended to recover a firearm. Like the officers in <u>Najar</u>, Officer Franklin proceeded only to the room the child had entered and did not deviate to other areas of the residence. He also took no action inside the room other than to retrieve the firearm. Under the circumstances, the manner and scope of Officer Franklin's actions were reasonable. As Officer Franklin had an objectively reasonable basis to believe that the child would present an immediate danger to himself or others when handling the firearm and as the manner and scope of Officer Franklin's actions were

reasonable, the Court finds that exigent circumstances existed to allow Officer Franklin to enter the bedroom and retrieve the firearm from the child.

### 3. Officers' Actions After the Recovery

The officers' actions after the recovery of the firearm in the bedroom, including seizing and taking the firearm to the TPD evidence storage facility, are within the consent exception to the Fourth Amendment's warrant requirement. As discussed above, consent requires that the party have actual or apparent authority to consent and that the consent be freely and voluntarily given. United States v. Sanchez, 608 F.3d 685, 689 (10th Cir. 2010).

While Moore did not have actual authority to consent to the seizure, she did have apparent authority. "[A] third party has apparent authority to consent . . . if a police officer reasonably, but erroneously, believes that the third party has actual authority to consent." United States v. Cos, 398 F.3d 1115, 1128 (10th Cir. 2007). "The apparent authority inquiry is an objective one." Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 188 (1990)). In the Tenth Circuit, actual authority is "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999). "[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." United States v. Kimoana, 383 F.3d 1215, 1222 (10th Cir. 2004). The testimony unambiguously demonstrates that Moore had apparent authority. The officers found the firearm in a dresser in her bedroom. Although she had previously denied the presence of a firearm, when confronted she stated that the firearm belonged to her. She told the officers that she had acquired the weapon as protection against a previous boyfriend, and the officers knew that Moore had been in at least one previous abusive relationship. Based on these facts, the officers would reasonably have believed that the

firearm belonged to Moore. This belief is evidenced by the fact that they told Moore that she could retrieve the weapon by claiming it at the TPD evidence storage facility. Thus, Moore had apparent authority to consent to the seizure.

Courts look to the totality of the circumstances to determine if consent has been freely and voluntarily given. United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007). As part of this analysis, "[t]he government must prove consent was given without duress or coercion, express or implied." United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992) (citing United States v. Price, 925 F.2d 1268, 1270-71 (10th Cir. 1991)). As discussed above, courts look to a variety of factors to determine if consent was coerced. See United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). The only factors that would weigh in favor of a finding of coercion are the number of officers present and the fact that the conversation took place in a nonpublic space. However, these are more than outweighed by the remaining factors, especially the fact that Moore did not simply consent to officers' seizure of the firearm, she affirmatively instructed the officers to seize the firearm. Moore's consent to officers' seizure of the firearm was free, voluntary, and uncoerced. As both parts of the analysis are met, Moore gave officers valid consent for their seizure of the firearm. Thus, there was no violation of defendant's Fourth Amendment rights as a result of the seizure.

Based on the testimony, the Fourth Amendment was not violated by officers' entry to Moore's home, by their sweep of the residence or their decision to investigate after the sweep, or by the seizure of the firearm.[10] Accordingly, there is no justification for the suppression of the firearm. See United States v. McCane, 573 F.3d 1037, 1042 (10th Cir. 2009).

---

[10]     As the Court finds that the Fourth Amendment was not violated by the officers' actions, the Court need not consider whether the independent source doctrine applies.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Dkt. # 17) is hereby

**denied**.

**DATED** this 1st day of December, 2014.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE